**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

WILLIAM LIVIOUS EPHRAIM,              )        CASE NO. 1:20cv00633
                                      )
                    Plaintiff,        )        JUDGE BENITA Y. PEARSON
                                      )
              v.                      )        MAGISTRATE JUDGE
                                      )        JONATHAN D. GREENBERG
ANDREW SAUL,                          )
              Commissioner            )
              of Social Security,     )
                                      )        **REPORT AND**
                    Defendant.        )        **RECOMMENDATION**


Plaintiff, William Ephraim, ("Plaintiff" or "Ephraim"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set

forth below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.    PROCEDURAL HISTORY

On November 2, 2017, Ephraim filed an application for SSI, alleging a disability onset date

of November 2, 2017,[2] and claiming he was disabled due to depression and sleep problems.

(Transcript ("Tr.") at 131, 154.)  The application was denied initially and upon reconsideration, and

Ephraim requested a hearing before an administrative law judge ("ALJ".)  (Tr. 71, 83, 97-99.)  On

January 16, 2019, an ALJ held a hearing, during which Ephraim, represented by counsel, and an

impartial vocational expert ("VE") testified.  (*Id*. at 38-60.)  On March 14, 2019, the ALJ issued a

written decision finding Plaintiff was not disabled.  (*Id*. at 12-31.)  The ALJ' s decision became final

on February 3, 2020, when the Appeals Council declined further review.  (*Id*. at 1-6.)

On March 25, 2020, Ephraim filed his Complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.)

Ephraim  asserts the following assignment of error:

> (1)    Whether the ALJ's decision is supported by substantial evidence when the
> residual functional capacity finding is not an accurate assessment of Mr. Ephraim's
> specific mental limitations.

(Doc. No. 13 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Ephriam was born in 1969, and was 48 years old on the date the application was filed, which

is defined as a younger individual age 18-49,  under social security regulations.  (Tr. 26.)  *See* 20

C.F.R. §§ 404.1563 & 416.963.  He has a tenth grade education and is able to communicate in

---

[2]     At his hearing on January 16, 2019, Ephraim amended the alleged onset date in
his initial claim to the date of his application, and limited his claim to Title XVI
benefits only.  (Tr. 40-41.)

English.  (*Id.*)  He has no past relevant work.  (*Id*.)

**B.     Relevant Medical Evidence**[3]

On October 18, 2017, medical care provider Philip Myers at the Cuyahoga County Corrections Center observed that Ephraim had normal mood, affect, behavior, judgment, and thought content. (Tr. 219.)

On November 28, 2017, consultative examining psychologist Michael Faust, Ph.D., conducted a psychological evaluation of Ephraim.  (*Id*. at 226-33.)  Ephraim reported that he was previously receiving disability benefits that were cut off in 2015 when he went to prison.  (*Id*. at 226.)  Ephraim reported spending a total of 17 years in prison, prior to his release on November 17, 2017. (*Id*. at 228.) Dr. Faust noted that Ephraim smelled strongly of alcohol and gave contradictory information regarding current use, although he reported drinking beer at a party the day before the evaluation. (*Id*. at 229.) Dr. Faust described Ephraim as irritable with a "mildly constricted" or "flattened affect," and intermittent eye contact.  (*Id*. at 229-30.)  He noted Ephraim "presented as agitated and appeared fearful about missing an appointment with his PO," described difficulty adjusting to life outside of prison, and was fidgety during the evaluation. (*Id*. at 230.) Dr. Faust diagnosed unspecified anxiety disorder; alcohol use disorder; and, antisocial personality disorder. (*Id*. at 231.) Dr. Faust opined that Ephraim had the following functional limitations:

- would not have difficulty understanding instructions but "may have some difficulty" remembering and carrying them out for task completion due to difficulty with anxiety;

---

[3]     The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Because no physical limitations are at issue in this case, evidence relating to Ephraim's physical impairments was not discussed by either party, and has been omitted herein.

3

- • "some" limitations in attention, concentration, persistence and pace related to his symptoms of unspecified anxiety disorder;

- • "some" limitations with regard to responding appropriately to supervision or coworkers due to unspecified anxiety disorder which results in social withdrawal, a fear of retaliation by people he has harmed in the past, and a pervasive feeling of lack of safety; and

- • limitations in his ability to respond appropriately to work pressures in an employment setting due to symptoms associated with unspecified anxiety disorder, antisocial personality disorder, and alcohol use disorder.

(*Id*. at 232-33.)  Dr. Faust noted that he did not believe Ephraim was capable of managing any funds awarded.  (*Id*. at 233.)

On January 24, 2018, Ephraim had a behavioral health appointment with Belinda Williams, Licensed Clinical Social Worker. (*Id.* at 278-79.)  Ephraim reported that he required medication to treat symptoms of depression, difficulty concentrating and irritability, but had not had access to medication since leaving jail.  (*Id*. at 279.)  He reported taking Seroquel and other psychotropic medications he could not identify.  (*Id*.)  Ms. Williams noted Ephraim displayed a flat affect, depressed mood, depressive cognition, slow monotone speech, and agitated behavior, and was malodorous for alcohol and possibly a chemical substance.  (*Id*.)  Ms. Williams scheduled Ephraim to meet with Dr. Tucker for medication evaluation. (*Id*. at 279.)

On January 30, 2018, Ephraim saw Dr. Henry Tucker to refill his mental health prescriptions. (*Id*. at 274.)  Ephraim reported being out of medication for two weeks and since then his condition was rapidly worsening. (*Id*. at 275.)  Ephraim stated "I don't want to shoot nobody.  I don't want to go back to jail."  (*Id*.)  Dr. Tucker observed Ephraim to be restless, labile, and anxious; depressed, fearful and irritable; with variable attention and concentration. (*Id*.)  Dr. Tucker diagnosed a severe episode of recurrent major depressive disorder with psychotic features. He prescribed Seroquel and

4

Trazodone. (*Id.*)

On June 7, 2018, Ephraim returned for counseling with Ms. Williams, who observed he had a blunted affect, tense mood, concrete thought process, depressive cognition, anxious speech, and cooperative behavior. Ephraim reported that the Seroquel was making him drowsy but he had difficulty staying asleep. (*Id.* at 273.)

On June 12, 2018, Ephraim returned to Dr. Tucker for treatment of headaches and concerns about his blood pressure. (*Id.* at 268.) Dr. Tucker's assessment was severe episode of recurrent major depressive disorder with psychotic features; psycho-physiological insomnia; and, essential hypertension. (*Id.* at 269)

On June 18, 2018, Ms. Williams noted Ephraim displayed a flat affect; a depressed, sad mood; his thought process was circumstantial and blocked with flight of ideas; depressive cognitions, slowed speech; and, nervous, agitated behavior. (*Id.* at 266.)

On June 26, 2018, Ms. Williams noted Ephraim's mental status remained essentially unchanged on June 26, 2018. (*Id.* at 265.)

On July 5, 2018, Ephraim underwent a behavioral health assessment. He reported depressed feelings, mood swings, anxiety, difficulty with sleep due to violent nightmares, and visual hallucinations. (*Id.* at 256.) At the conclusion of the assessment, the diagnostic impression was schizoaffective disorder, bipolar type; rule out post-traumatic stress disorder. (*Id.* at 263.)

On July 10, 2018, Ephraim followed-up with Dr. Tucker reporting that he was feeling fairly well. He was not nervous or anxious and was not experiencing insomnia. (*Id.* at 252.) During the examination, Dr. Tucker noted Ephraim had a flat affect. (*Id.* at 253.)

On August 2, 2018, Ms. Williams noted Ephraim was depressed, irritable, and tense; he had

a blunted affect; his thought process was blocked; he had depressive cognitions; behavior was cooperative. (*Id*. at 251.)

On August 9, 2018, and September 4, 2018, Ephraim received counseling, and Ms. Williams noted no significant change in his mental functioning.  (*Id*. at 249, 248.)

On September 18, 2018, Ms. Williams noted Ephraim displayed a blunted affect; depressed, irritable, tense mood; and concrete thought process.   Ephraim's thought content was unremarkable and his behavior was cooperative. (*Id*. at 246.)

On October 2, 2018, Ms. Williams noted Ephraim displayed a blunted affect; depressed, sad mood; concrete thought process; depressive cognitions; slowed, monotone speech; and cooperative behavior. (*Id*. at 244.)

On October 11, 2018, Ms. Williams noted Ephraim displayed a blunted affect; depressed, irritable, tense mood; had loose associations; his speech was soft and anxious; and his behavior was restless, nervous and agitated. (*Id*. at 243.)

On October 18, 2018, Ephraim reported to Dr. Tucker that he was generally feeling well but was experiencing a racing heart. (*Id*. at 238.)  Dr. Tucker noted Ephraim displayed a blunted affect, and his speech was delayed. (*Id*. at 239.)

On October 19, 2018, Dr. Tucker completed a mental residual functional capacity assessment of Ephraim. (*Id*. at 235-37.)  Dr. Tucker stated his speciality was internal medicine. (*Id*. at 235.) He reported four visits with Ephraim, for treatment of schizophrenia, unspecified; major depression; post-traumatic stress disorder; and essential hypertension. (*Id*.)  Dr. Tucker reported that, with treatment, Ephraim had become marginally functional.  (*Id*.)  In a work setting, Dr. Tucker opined that Ephraim would be off-task greater than 25 percent of the time, with "at this point poor" ability

6

to sustain an eight hour work day, five days per week. (*Id*.) Dr. Tucker assessed moderate to marked limitations in Ephraim's ability to perform the mental requirements of work activities. (*Id*. 236-237.) Dr. Tucker opined that Ephraim's mental condition had been major and severe for "probably years," but has had recent exacerbations within the past year following post incarceration. (*Id*. at 237.)

**C.      State Agency Reports**

On December 13, 2017, state agency reviewing psychologist Carl Tishler, Ph.D. reviewed the record and noted evidence of an anxiety, obsessive/compulsive disorder, and substance addiction disorder.  Dr. Tishler opined that these were non severe impairments. (*Id*. at 66-67.)

On January 24, 2018, state agency reviewing psychologist Audrey Todd, Ph.D., reviewed Ephraim's file and determined that Ephraim's anxiety and obsessive/compulsive disorder and his substance addiction disorder (alcohol) were severe impairments.  (*Id*. at 76.) She further opined that Ephraim had the following functional limitations:

- •      moderate limitations with his ability to interact with others;

- •      moderate limitations with his ability to concentrate, persist or maintain pace; and

- •      moderate limitations in Mr. Ephraim's ability to adapt or manage himself.

(*Id*. at 76.)  Dr. Todd opined that Ephraim is capable of performing short and occasional multi-step tasks in a setting with flexible pace and production requirements; can engage in superficial social contact with others in a work setting; and is able to adapt to infrequent changes in routine.  (*Id*. at 79-80.)

**D.      Hearing Testimony**

During the January 16, 2019 hearing, Ephraim testified to the following:

- •      He is 49 years old and completed tenth grade "only because they pushed me."  (Tr. 41.)

7

- He is "bouncing from address to address," and currently lives with a friend in Cleveland.  (*Id*. at 42.)

- In 2012 and 2013, he worked for his brother-in-law as a roofer, picking trash up. (*Id*.)

- He is currently on probation.  He has been taking urine tests, so he isn't drinking or taking drugs.  (*Id*. at 42-3.)

- He feels he is disabled because he cannot sleep, he's real irritable, he's been "busted in my head, stomped," and he has mood swings, anger issues, and gets agitated real fast.   (*Id*. at 43.)

- Medicine helps a little bit.  When he gets frustrated, he takes medicine so he can sleep and relax.  (*Id*.)

- The most recent felonious assault was initiated by his brother-in-law, who jumped on Ephraim when he intervened in a fight between his brother-in-law and his sister. They started fighting and Ephraim stabbed him.  (*Id*. at 44.)

- He takes his medication regularly.  He was on medication at the time of the fight. (*Id*.)

- He sees a counselor every two weeks.  (*Id*. at 45.)

- In the past three years, he only was faced with people who were not part of his family in jail.  When he was sleeping, they pulled him off his bed and they went and fought in the bathroom.  He was always fighting in jail.  (*Id*. at 46.)

- Since his release from prison, he has fought with his girlfriend, who kicked him out of her house.  He doesn't have friends, so he went to live with his cousin.  He is trying to walk away from fights before they turn physical.  (*Id*. at 48.)

- He has mood swings and is edgy around unfamiliar people.  He gets jumpy when people are behind him, because he was hit in the back of the head with a gun.  (*Id*. at 49.)

- He is forgetful, but manages to make it to appointments because he gets telephone calls reminding him to get ready, and a car or bus picks him up.  (*Id*. at 50.)

- His medications cause sexual dysfunction and headaches.  (*Id*. at 51.)

- He sleeps three or four hours a night.  He doesn't sleep during the day.  He has

8

dreams that disturb him, and visualizes finding his mother dead when he was a child.  (*Id*. at 51-2.)

• On bad days, he sits in the house and doesn't want to be bothered by anyone. (*Id*. at 52.)

The VE testified Ephraim had past work as a roofer's helper, an unskilled job, classified as very heavy, performed at the light level.  (*Id*. at 54.)  The ALJ then posed the following hypothetical:

> This person is male, same age and education as Mr. Ephraim, same work background as Mr. Ephraim.  This person has no physical limitations, however this person can do no complex tasks, but can do simple routine tasks.  The tasks should not involve high-production quotas or piece rate work. And because of psychological issues, should not involve high concentrations of noise.
>
> This person can have superficial interpersonal interactions with the public, co-workers and supervisors.  And by superficial   let's make it superficial and occasional.  With regard to superficial, I define that to mean no arbitration, confrontation, negotiation, supervision or commercial driving.

(*Id*.)

The VE testified the hypothetical individual would not be able to perform Ephraim's past work as roofer's assistant because of the noise level.  (*Id*.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as marker, produce weigher, and assembler.  (*Id*. at 55.)

The ALJ then asked whether there would be jobs if the individual had to work in isolation. (*Id*.)  The VE responded there would be no work if the individual worked in total isolation but, if the individual could work in proximity to others, with no interaction, the jobs previously identified would remain available. (*Id*. at 55-6.)

In response to questioning from Ephraim's counsel, the VE testified that if an individual would be off-task at least 20 percent of the time, all competitive work would be eliminated.  (*Id*. at

56.) The VE explained that four percent is the maximum time an individual could be off-task and still meet production standards. (*Id*.) The VE also testified that an individual who needed flexibility in pace and production requirements could still maintain competitive employment if the individual could meet a production quota of 92 percent, on average. (*Id*. at 57.) The VE explained that, in a manufacturing setting, workers come in contact with other coworkers during the course of the day, and can work independently but cannot isolate themselves. (*Id*. at 58.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 & 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) &

10

416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 2, 2017, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: anxiety disorder; alcohol use disorder; antisocial personality disorder; major depressive disorder with psychotic features; schizophrenia, unspecified; and post-traumatic stress disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can do no complex tasks, but he can do simple, routine tasks. The tasks should not involve high production quotas or piece rate work. The tasks should not involve high concentrations of noise. He can have superficial and occasional interpersonal interactions with the public, coworkers, and supervisors and "superficial" means no arbitration, confrontation, negotiation, supervision, or commercial driving.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on ***, 1969 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past

11

relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act since November 2, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-27).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v.*

12

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No.

13

1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Ephraim asserts that the ALJ erred by failing to support his determination of residual functional capacity ("RFC") with substantial evidence. (Doc. No. 13 at 9.) He assets that the RFC adopted by the ALJ does not accurately assess his specific mental limitations. (*Id*.) Specifically, he disputes the ALJ's determination that his mental health symptoms improved with medication. (*Id*.) He also argues that the ALJ did not properly weigh the opinions of Dr. Faust and Dr. Tucker, and failed to include Dr. Todd's proposed limitation of flexible pace and production requirements despite stating that he accepted her assessment. (*Id*. at 11-14.)

The Commissioner responds that the ALJ's decision should be affirmed because he appropriately found that Dr. Todd's findings were persuasive, accounted for Dr. Faust's opinions, and found that Dr. Tucker's opinions were not persuasive. (Doc. No. 15 at 8.) He notes that these three sources offered somewhat conflicting opinions and administrative medical findings, and asserts that the ALJ properly resolved the conflicts in the evidence. (*Id*.)

Since Ephraim's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative

14

medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered

---

[4]     The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5]     The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

Under both the prior and Revised Regulations, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its

16

judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") For all the reasons discussed below, the Court finds the ALJ provided good reasons for his determination of Ephraim's RFC and supported those reasons with reference to substantial evidence in the record. Ephraims's argument to the contrary is without merit.

**A.     The Opinion of Dr. Faust**

Ephraim asserts that the ALJ erred when he declined to include Dr. Faust's assessment in the RFC finding because the ALJ "unreasonably" determined that Mr. Ephraim's symptoms improved with medication. (Doc. No. 13 at 11.)

The Commissioner responds that substantial evidence supports the ALJ's finding that medication helps the claimant's psychological symptoms, and argues that Ephraim's assertion of error is based on a false premise, because the ALJ fairly accounted for Dr. Faust's opinions in the RFC finding. (Doc. No. 15 at 10-11.)

Consultative examining psychologist Dr. Faust evaluated Ephraim on November 28, 2017, shortly after his release from prison, at the request of the state agency. (Tr. 226-33.) He denied taking any prescription medications at the time of the interview. (*Id*. at 228.) Dr. Faust opined that Ephraim had the following functional limitations:

- would not have difficulty understanding instructions but may have "some" difficulty remembering and carrying them out for task completion due to difficulty with anxiety;

17

- • "some" limitations in attention, concentration, persistence and pace related to his symptoms of unspecified anxiety disorder;

- • "some" limitations with regard to responding appropriately to supervision or coworkers due to unspecified anxiety disorder which results in social withdrawal, a fear of retaliation by people he has harmed in the past, and a pervasive feeling of lack of safety; and

- • limitations in his ability to respond appropriately to work pressures in an employment setting due to symptoms associated with unspecified anxiety disorder, antisocial personality disorder, and alcohol use disorder.

(*Id*. at 232-33.) Dr. Faust noted that he did not believe Ephraim was capable of managing any funds awarded.  (*Id*. at 233.)

The ALJ addressed Dr. Faust's opinion as follows:

Dr. Faust's medical opinion is persuasive because he supported it with an explanation and with his own observations.  However, at the time of the examination, the claimant was not taking any psychotropic medications and the subsequent medical evidence of record shows that medication helps the claimant's psychological symptoms.

(Tr. 22.)

In his RFC determination, the ALJ adopted Dr. Faust's recommended limitations as follows:

- • limiting Ephraim to simple, routine tasks, with no complex tasks;

- • limiting Ephraim to tasks that do not involve high production quotas or piece rate work.;

- • limiting Ephraim to tasks that do not involve high concentrations of noise; and

- • limiting Ephraim to superficial and occasional interpersonal interactions with the public, coworkers, and supervisors, where "superficial" means no arbitration, confrontation, negotiation, supervision, or commercial driving.

(*Id*. at 19.)

Ephraim's assertion that the ALJ's determination that his symptoms improved with medication is "unreasonable" is in conflict with both the medical evidence and Ephraim's own

18

testimony.  The record shows that Ephraim sought refills of his medications in January 2018, shortly after discharge from prison, and at this initial meeting, his counselor, Ms. Williams, noted "[p]atient reports he requires medication" to treat symptoms of depression, difficulty concentrating and irritability, but had not had access to medication since leaving jail.  (*Id*. at 279.)  At his medical evaluation, he reported that he "has been out of medicine x2 weeks.  Since then his condition is rapidly worsening."  (*Id*. at 275.)  Further, at the hearing, Ephraim testified "I'm on medicine and sometimes, you know, when I get like frustrated I, you know, take my medicine so I can sleep and relax. . . . the medicine, it help me, it help me a little bit."  (*Id*. at 43.)

Ephraim asserts that records show "only marginal improvement with medication," and cites records showing that his mental impairments continued to impact Ephraim's daily life.  (Doc. No. 13 at 11.)  However, there is no evidence cited by either party or noted by the Court in the record that either Ephraim or a care provider considered the medication ineffective and sought alternative or additional pharmaceutical treatments.  In contrast, there was ample evidence supporting the ALJ's conclusion that medication significantly improved Ephraim's functional capacity, although it did not eliminate his impairment.[6]  Further, as noted *supra*, the ALJ did not "decline to  include Dr. Faust's assessment in the [RFC] finding."  (*Id*.)  Instead, he adopted many of the limitations in Dr. Faust's opinion, albeit after translating them into more function-specific language.

For the foregoing reasons, the ALJ appropriately addressed the opinion of consultative examiner Dr. Faust under the Revised Regulations.  Therefore, this assignment of error is without merit.

---

[6]     This conclusion is supported by the treatment noes of Dr. Tucker, discussed in section VI.B., below.

**B.     The Opinion of Dr. Tucker**

Ephraim also asserts that the ALJ "unreasonably" determined that general practitioner Dr. Tucker's opinion was not persuasive because it was not supported by treatment notes and not consistent with the course of treatment. (Doc. No. 13 at 12, citing Tr. 24.)  He argues that Dr. Tucker's opinion is supported by his initial evaluation of Ephraim and the contemporaneous treatment notes submitted by social worker Williams.  (*Id*.)

The Commissioner responds that , substantial evidence supports the ALJ's finding that the treatment notes did not support Dr. Tucker's opinion, and appropriately contrasted Dr. Tucker's opinions with Ephraim's limited course of treatment.  (Doc. No. 15 at 12.)

Dr. Tucker completed a mental residual functional capacity assessment of Ephraim on October 19, 2018, after treating him four times for schizophrenia, unspecified; major depression; post-traumatic stress disorder; and essential hypertension. (*Id*. at 235-37.)  Dr. Tucker reported that, with treatment, Ephraim had become marginally functional.  (*Id*.)  In a work setting, Dr. Tucker opined that Ephraim would be off-task greater than 25 percent of the time, with "at this point poor" ability to sustain an eight hour work day, five days per week.  (*Id*.) Dr. Tucker assessed moderate to marked limitations in Ephraim's ability to perform all of the mental requirements of work activities. (*Id*. 236-237.)

The ALJ addressed Dr. Tucker's opinion as follows:

Dr. Tucker's medical opinion is not persuasive because it is not supported by treatment notes.  As recounted above, in January 2018, Dr. Tucker documented multiple abnormal psychiatric findings, but he also documented that the claimant had been out of his psychotropic medications and his condition was "rapidly worsening." Dr. Tucker started Seroquel and Trazodone and with treatment, in July 2018, Dr. Tucker documented that the claimant's affect was flat/blunted, but his cognition and memory were "normal."  In October 2018, Dr. Tucker documented that the claimant's affect was flat/blunted and his speech was delayed, but his behavior was

> "normal," his thought content was "normal," his cognition was "normal," and his
> memory was "normal."  Furthermore, his medical opinion is not persuasive because
> it is not consistent with the limited course of treatment    the claimant has not been
> psychiatrically hospitalized and there are no Emergency Department visits for acute
> psychiatric symptoms.  The claimant has not required or received frequent or
> intensive outpatient mental health services and there is no evidence of the claimant
> requiring or receiving "special" supervision.  While I find the claimant has some
> limitations, I find that Dr. Tucker's medical opinion of such severe limitations is not
> persuasive because it is not supported by the treatment notes or the limited course of
> treatment.

(Tr. 24.)

As the ALJ explained, the treatment notes from the period after Ephraim resumed his medication reflect continuing mental health impairments, but not at the severity described by Dr. Tucker.  Although the initial evaluation documented extreme impairment, Dr. Tucker's records from Ephraim's three subsequent visits either documented no abnormalities, or noted that Ephraim, had impairments such as a flat or blunted affect and delayed speech, but displayed normal cognition, memory, behavior, and thought content.  (*Id*. at 24, 269, 239, 253.)

Next, Ephraim argues that the ALJ "improperly" inferred from his limited course of treatment that he had mild limitations to his RFC, arguing that he " does not have a medical condition which requires psychiatric hospitalization.  He is neither suicidal nor homicidal which are generally the criteria for psychiatric hospitalizations."  (Doc. No. 13 at 12.)  Such an inference is proper as a matter of law.  *See, e.g., Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 850 51 (6th Cir. 2020) ("Substantial evidence indeed supports the ALJ's conclusion in the present case.. . . [including] that [Plaintiff] pursued a conservative line of treatment.");  *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir.1983) (An ALJ "is entitled to rely not only on what the record says, but also on what the record does not say.").  Further, it is not clear that Ephraim was never a candidate for hospitalization due to his mental impairments.  For example, at the time of his initial consultation with Dr. Tucker,

21

he expressed a fear that he would harm others, stating "I don't want to shoot nobody. I don't want to go back to jail." (Tr. 275.) The record reflects that this concern did not recur after Ephraim resumed medication, supporting the ALJ's determination that a limited course of treatment medication and bi-weekly counseling successfully controlled Ephraim's most debilitating symptoms.

The ALJ did not restrict his analysis to the lack of psychiatric hospitalization, which is one of the most aggressive possible treatments. He also noted Ephraim "has not required or received frequent or intensive outpatient mental health services and there is no evidence of the claimant requiring or receiving 'special' supervision." (*Id*. at 24.) Ephraim does not acknowledge or address the absence of these other types of more intensive treatment discussed by the ALJ, and overlooks evidence in the record that Ephraim did not need to be completely isolated from others. For example, Ephraim testified that he takes the bus, and the only obstacle he encounters is finding money to pay the fare. (*Id*. at 49.) He places great weight on his hearing testimony that, on "bad days" he sometimes "sit there and just be in the house all day, don't want to be bothered by nobody." (*Id*. at 52.) However, there is no record evidence that Ephraim was unable to attend scheduled appointments because of mental health symptoms, and he reported to Dr. Faust that he went on "daily dates with his significant other."[7] (*Id*. at 231.) Finally, as discussed in section VI.A., *supra*, neither the parties not the Court found evidence in the record that car providers considered alternative or additional pharmaceutical treatments, from which the ALJ could reasonably infer the established medications was deemed effective. Thus, the issues raised by Ephraim reflect, at most,

---

[7]     Ephraim also testifies at the hearing that his significant other had broken up with him, which provides a credible explanation for this apparent inconsistency. (Tr. 48.)

22

a conflict in the evidence which was properly addressed by the ALJ.  It is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")

For the foregoing reasons, the ALJ appropriately addressed the opinion of Dr. Tucker under the Revised Regulations.  Therefore, this assignment of error is without merit.

**C.**  **The Opinion of Dr. Todd**

Finally, Ephraim asserts that the ALJ erred by adopting an RFC that accounted for state agency reviewing psychologist Dr. Todd's opinion that Ephraim would need a setting with flexible pace and production requirements, despite deeming Dr. Todd's "persuasive."  (Doc. No. 13 at 13.)

The Commissioner responds that the ALJ went beyond the limitations in Dr. Todd's opinion by limiting Ephraim to work with no "high production quotas or piece rate work." (Doc. No. 15 at 9.)  Further, he notes that the VE testified employers will look "realistically" at production quotas and be flexible in letting an employee meet the quota over the course of a week if he or she has a "bad day" (*Id.*, citing Tr. 57-58).  He asserts that the ALJ's residual functional capacity determination is therefore consistent with the limitation in Dr. Todd's finding.

On January 24, 2018, state agency reviewing psychologist Dr. Todd reviewed Ephraim's file and opined that Ephraim had the following functional limitations:

- moderate limitations with his ability to interact with others;

23

- moderate limitations with his ability to concentrate, persist or maintain pace; and

- moderate limitations in Mr. Ephraim's ability to adapt or manage himself.

(Tr. 76.)  Dr. Todd opined that Ephraim is capable of performing short and occasional multi-step tasks in a setting with flexible pace and production requirements; can engage in superficial social contact with others in a work setting; and is able to adapt to infrequent changes in routine.  (*Id.* at 79-80.)

> The ALJ addressed Dr. Todd's opinion as follows:
>
> Dr. Todd's medical finding is more persuasive because it is better supported by the objective medical evidence and is more consistent with the course of treatment. However, I find it reasonable to add limitations of no tasks involving high concentrations of noise because of the claimant's psychological issues.  Further, I have reworded Dr. Todd's mental residual functional capacity using more precise terms, as set forth above.

(*Id.* at 26.)

> Ephraim contends that because the ALJ stated that he was re-wording Dr. Todd's proposed limitations, he imposed upon himself an additional obligation to explain how each of his limitations reflected the limitations in her opinion.  The Court rejects this argument.  Under the previous regulations, when an ALJ accorded "great weight" to a medical opinion, the ALJ was not required to adopt every facet of the opinion expressed by the medical source.  *See Taylor v. Colvin*, 2013 WL 6162527 at *15 (N.D. Ohio Nov. 22, 2013) (finding ALJ was not required to adopt every opinion of an ME "by virtue of the fact that, overall, he gave [the ME's] opinion great weight").  *See also White v. Comm'r of Soc. Sec.*, 2013 WL 4817673 at * 16 (N.D. Ohio 2013) (noting that "[t]he fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself").  The Revised Regulations provide no basis for abandoning this precedent.  Thus, although the ALJ deemed Dr. Todd's opinion "persuasive," and

24

stated that he was rewording her recommended limitations, he was not required to include every element of all of her proposed limitations in the RFC or explain why he did not adopt all of the proposed limitations. *See, e.g., Hedick v. Berryhill*, No. 1:17CV2310, 2018 WL 6348759, *6 (N.D. Ohio Nov. 14, 2018), *report and recommendation adopted by* 2018 WL 6344611 (N.D. Ohio Dec. 4, 2018).

Further, as the Commissioner points out, it is reasonable to infer that the ALJ adopted Dr. Todd's proposed "flexible pace and production requirement" limitation, and re-worded it as "tasks should not involve high production quotas or piece rate work." (Tr. 19, 79.) This interpretation is both logical and consistent with the VE's testimony that employers are generally flexible in letting an employee meet the quota over the course of a week. (*Id.* at 57-58.)

For the foregoing reasons, the ALJ appropriately addressed the opinion of state agency reviewing psychiatrist Dr. Todd under the Revised Regulations. Therefore, this assignment of error is without merit.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 8, 2021

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**